873 So.2d 768 (2004)
STATE of Louisiana
v.
Ron CRAWFORD.
No. 03-KA-1494.
Court of Appeal of Louisiana, Fifth Circuit.
April 27, 2004.
*771 Harry J. Morel, Jr., Kim K. McElwee, Luling, LA, for Plaintiff/Appellee.
Prentice L. White, Baton Rouge, LA, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On June 20, 2002, the St. Charles Parish District Attorney filed a bill of information charging defendant, Ron Crawford, with Count 1: felon in possession of a firearm in violation of LSA-R.S. 14:95.1, and Count 2: illegal possession of stolen things in violation of LSA-R.S. 14:69. Defendant was arraigned on July 22, 2002 and pled not guilty.
On January 22, 2003, the state severed Count 2 and amended Count 1 of the bill of information to reflect that defendant's previous conviction was for manslaughter. On that same date, defendant was arraigned on the amended bill and pled not guilty. On January 22 and 23, 2003, the case was tried before a 12-person jury which unanimously found defendant guilty as charged. Defendant orally moved for an appeal.
On February 13, 2003, the trial court sentenced defendant to imprisonment at hard labor for 15 years without benefit of parole, probation, or suspension of sentence. The trial court also fined defendant $1,000, but then suspended it. Defendant filed a motion for appeal on February 19, 2003 that was granted.
*772 FACTS
The state called the following witnesses to testify at trial: Corporal Richard Oubre, Deputy Clint Patterson, Crime Scene Technician Troy Becnel, and Detective Claude Adams.
St. Charles Parish Sheriff's Office Corporal Richard Oubre and Deputy Clint Patterson, testified that, on June 12, 2002, at approximately 2:00 a.m., they were patrolling the East Bank of St. Charles Parish when they received a call in reference to a shooting that had occurred on Paul Frederick Street on the West Bank. Cpl. Oubre drove to the East Bank Bridge Park and waited in case the West Bank unit needed assistance. They were told to be on the lookout for a black male, 5'8" to 6' tall, with a slim build, and wearing a white T-shirt and dark pants.
They subsequently drove to the West Bank. As they headed back toward the East Bank, Cpl. Oubre and Deputy Patterson observed a black male, later identified as defendant, walking up the shoulder of the on-ramp onto the Luling-Hale Boggs Bridge from the West Bank. Cpl. Oubre testified that he was driving a marked police unit, and that he and Deputy Patterson were both dressed in police uniform.
When they drove past defendant, defendant looked away from them. Cpl. Oubre subsequently pulled in front of defendant and stopped approximately 50 to 75 feet in front of him. Cpl. Oubre thought that something did not look right and that something might be wrong with defendant. Deputy Patterson explained that they did not see a car broken down anywhere, so they stopped to see what was going on.
Cpl. Oubre and Deputy Patterson approached defendant, and defendant walked toward them. However, defendant did not make eye contact with the officers or make any gestures to indicate that he might be in need of help or was broken down and looking for a ride, which caused Cpl. Oubre to become suspicious.
Cpl. Oubre asked defendant what was going on and what was wrong, and defendant told him that someone had tried to kill him and that he (defendant) had a gun. They did not recall whether defendant said he had been carjacked. Cpl. Oubre testified that once he noticed that defendant was sweating, out of breath, and covered with mud, and remembered that a shooting had occurred earlier on the West Bank, he thought that defendant was the shooter.
Cpl. Oubre put one hand on defendant and told defendant to place his hands on the bridge railing. As they walked toward the bridge, defendant reached down into his waist. Cpl. Oubre told him not to do that or he would shoot defendant. Deputy Patterson testified that defendant did not point to the weapon, but that he reached for the weapon with an open hand. Defendant subsequently placed his hands on the railing, and Cpl. Oubre reached into defendant's waist and pulled out a .40 caliber pistol. He told Deputy Patterson to handcuff defendant.
Cpl. Oubre testified that, as he unloaded the gun, he observed that there was one bullet in the chamber ready to be fired and one in the magazine. They called Detectives Claude Adams and Rodney Madere who were investigating the West Bank shooting and told them that they had stopped someone who fit the description of the perpetrator. The detectives subsequently came to the bridge.
St. Charles Parish Sheriff's Office Detective Claude Adams testified that, on June 12, 2002, at 12:55 a.m., he received a call regarding shots being fired in the 700 or 800 block of Paul Frederick Street, "a high crime, high drug area." Det. Adams testified that when he arrived at the crime scene, he observed a bicycle lying on the *773 road, spent .40 caliber casings south of the bicycle, and a spent .380 caliber casing south of the .40 caliber casing. When he left that crime scene, he went to St. Charles Hospital where he observed Darron Williams in a hospital bed suffering from gunshot wounds.
Mr. Williams told Det. Adams that he was riding his bicycle north on Paul Frederick Street when someone approached him from the north with a handgun and started shooting at him. Mr. Williams explained that he fell off the bicycle and started running back to a trailer where he asked for assistance. He stated that the person who shot him fled on Paul Frederick Street. Mr. Williams described the shooter as a black male, approximately 5'10" to 6' tall, slim build, and wearing a white T-shirt and dark colored pants.
Mr. Williams denied shooting a gun when Det. Adams questioned him initially. Det. Adams ordered crime scene technician Troy Becnel to do a gunshot residue test on Mr. Williams.[1] When they were preparing to do the gunshot residue test, Mr. Williams admitted he had shot a .380 caliber gun.
Det. Adams subsequently heard Cpl. Oubre on the radio, so he went to the Hale Boggs Bridge. Det. Adams arrived at the bridge at approximately 2:15 a.m., and Cpl. Oubre advised him that defendant had said he was carjacked. Det. Adams testified that defendant subsequently told him several different versions regarding what had happened relative to the carjacking.
Defendant told Det. Adams that he and his friend had come from New Orleans and were on Paul Frederick Street for an undisclosed reason. Defendant explained that a person then walked in front of their car with a handgun and stopped them. Defendant told Det. Adams that he was taken out of the car and that that person was patting him down, at which time he grabbed the gun of the person who was patting him down. According to defendant, "a struggle ensued, and then the person shot himself a couple of times."
Defendant told Det. Adams that he took the gun and fled into the woods, making his way through the cane field, and that his friend had left him. Defendant subsequently came up to the interstate. Defendant also told Det. Adams at one point that they had come from New Orleans to buy some marijuana. Det. Adams testified that the distance from Paul Frederick Street to the bridge was approximately one and a half miles.
Det. Adams explained that defendant could not tell him what kind of car he was in when he was almost carjacked; he did not know the name of the friend who was with him; and he gave no description of the person who attempted to carjack him. Det. Adams further testified that, once he "learned the gun had come back stolen," he stopped talking to defendant at that point. He also testified that he stopped talking to defendant about the carjacking when defendant would not give him anymore details.
After Det. Adams left the bridge, he went back to the hospital. Det. Adams subsequently showed Mr. Williams a photographic lineup with defendant's photograph in it; however, Mr. Williams could not make a positive identification.
The defense called the following witnesses to testify at trial: Evelyn Turner,
*774 Gloria Triche, Darron Williams, Det. Claude Adams, and defendant.
Defendant admitted that he was a convicted felon, that he had previously pled guilty to aggravated battery and to manslaughter, and that he had used drugs in the past.
Defendant testified that, on June 11, 2002, he was at a girlfriend's house in the Lafitte housing project in New Orleans. He subsequently left the house and went to a convenience store to buy cigarettes and beer. Defendant was outside the store talking to some men when an acquaintance, who he only knew by the nickname of "Black," asked defendant to take a ride with him. Defendant testified that he knew "Black" from another acquaintance, and that he did not know where "Black" lived.
Defendant and "Black" left the store. "Black" told defendant that he was going to Paul Frederick Street to pick up something. Defendant did not know why they were going to Paul Frederick Street, and he did not know that they were going there to get drugs. Defendant testified that he did not know the make and model of the vehicle he was in, but that it was a four-door, dark-colored sedan. He explained that there were no guns in the vehicle that he knew of.
Defendant testified that, before "Black" turned onto Paul Frederick Street, he exited the vehicle to make a phone call. Defendant remained in the vehicle. They subsequently went to Paul Frederick Street, stopped for a minute, and then "Black" got out of the vehicle. Defendant was still in the vehicle. After "Black" had been out of the vehicle for approximately two or three minutes, someone approached. Defendant exited the vehicle to rest and to stretch his legs.
When defendant looked around, he saw that the man "Black" he was talking to had pulled a gun. Then another man came up and pulled a gun on defendant. The man put the gun in defendant's face and asked him if he had any money. He grabbed defendant by the shirt and dragged him to the front of the car. The man tried to hit defendant across the head with the gun. Defendant and the man began struggling with the gun, and, as they did so, the gun went off two or three times.
Defendant took the gun and the man started running. The other man then started shooting at defendant. Defendant ran south, jumped the fence, and ran into the cane fields. He thought that if the man caught him, he was going to kill him. Defendant headed toward the bridge. He did not look back, but continued to run, ending up on the on-ramp on the bridge.
When he was on the bridge, he noticed that a vehicle was coming up behind him. When he turned around, but before he could flag the vehicle down, the police officers had pulled in front of him. When the officers got out, he told them about the carjacking and the robbery, and that he had a gun on him that he had wrestled from one of the men.
Defendant testified that the officers did not believe him and did not want to listen to him. While he was on the bridge, the detective asked him if he had ever been arrested. Defendant told him that he had been home for 16 months, but that he had previously been convicted of manslaughter. Defendant explained that the officer terminated the conversation once he told him about his prior conviction. They handcuffed him.
Defendant testified that he did not try to run away when he saw the police vehicle, because he did not do anything wrong. He further testified that he did not try to throw the gun over the bridge or get rid of *775 it, because he thought his life was in danger while he was on the bridge. When the officers asked him if he had a gun, defendant told them he did and pointed to it. He denied reaching for the gun.
Defendant testified that, on the night in question, he saw Mr. Williams take drugs from "Black." Defendant denied walking up to Mr. Williams and trying to kill him. He testified that he did not know Mr. Williams, that it was his first time in St. Charles Parish, and that he did not own a gun, but that he had shot a gun in the past. He denied shooting a gun on June 12, 2002. He admitted that it was illegal for him to possess a gun because he was a felon.
Defendant claimed he gave Det. Adams a description of the vehicle he was in and the name of "Black." He testified that the.40 caliber gun that was in his possession was the gun that had gone off, but that he did not struggle with Mr. Williams but with another man. Defendant explained that it was a coincidence that he ended up with the same gun that shot Mr. Williams, and that the man defendant was wrestling with did not get shot.[2]
Darron Williams admitted that he had previously been convicted of second degree battery and distribution, that he had pled guilty on March 10, 1999 to possession of stolen property, and that he had pled guilty on July 12, 1999 to disturbing the peace, illegal carrying of weapons, and aggravated assault.
Mr. Williams testified that, on June 12, 2002, he was at his fiancée's house at 807 Paul Frederick Street. He left his fiancée's house to go to his mother's house at 696 Paul Frederick Street, but he was unsure of the time. Mr. Williams explained that he was riding his bicycle north on Paul Frederick Street when he observed someone walking south. When they were approximately four feet apart, that person shot him. Mr. Williams fell off his bicycle and tried to run, and the person shot him again.
At that time, he had been hit in the side and in the buttocks. Mr. Williams started running. He tried to get behind a trailer, but did not make it and got hit again in the wrist. Mr. Williams looked around one corner, then another, and then ran to the house at 802 Paul Frederick Street.
He testified that he sold drugs in the past, but that he was not selling drugs on the night in question, and that he did not sell or use drugs. He denied that he and a friend attempted to carjack and rob defendant and his acquaintance. He denied having a .380 caliber gun on him that night. Mr. Williams was aware that the gunshot residue tests done on him were positive, but he explained that by stating that he had shot a .380 caliber gun earlier that day.
In response to questioning regarding the presence of gunshot residue on his hands, Mr. Williams testified that his young nephew had found a gun, that the gun went off, that he gave it to his stepfather, and that his stepfather told him to throw it in the river. Mr. Williams testified that he did not know defendant, and that he did not know why his assailant would walk up to him and shoot him. Mr. Williams testified that the doctor told him he had been shot four times, but he could *776 not explain why the medical records showed that he had only been shot twice.
Evelyn Turner testified that she lived at 715 Paul Frederick Street in Luling. She explained that, on June 12, 2002, she heard several shots coming from the north and the south of her house. Ms. Turner testified that she heard five shots in a row, and then one shot. Ms. Turner further testified that she did not see anything that night, but that she had seen Mr. Williams on the street in the past, and that he was a drug dealer.
Gloria Triche testified that she lived at 717 Paul Frederick Street in Luling. She testified that, on the night of June 12, 2002, she went into her room to go to bed and heard shots. She called the sheriff's department to tell them to send someone immediately. Ms. Triche testified that she heard the first shots to the north of her house, and then heard shots to the south of her house. Ms. Triche heard five or six shots total. After she heard the shots, she looked out the viewing glass on her door and saw a man wearing a white shirt and dark pants running toward the south.
Ms. Triche testified that she subsequently observed a big dark car pass by with the driver's side door open going the same way, and then a truck passed behind the car going the same way. She thought that the car was associated with the shooting. Ms. Triche testified that she was familiar with Mr. Williams' reputation, that she had seen him on the street where she lived either buying or selling drugs, and that she would not believe him to be a truthful person.
After hearing the evidence, the jury found defendant guilty as charged.
ASSIGNMENT OF ERROR NUMBER ONE
The district court committed reversible error once it allowed the State to use several racial and unprofessional comments as reasons for excluding African-American jurors from the jury panel during voir dire.
DISCUSSION
Defendant contends that the state's off-hand and unprofessional comments during voir dire were contemptible and evidence of the state's discriminatory intent to exclude African-American jurors. He does not argue that the state's reasons for excluding the potential jurors were not race neutral, only that the prosecutor was insincere in her reasons, as evidenced by the following comments during voir dire: that one potential juror, Mr. Taylor, had the "look of a drug dealer;" that another potential juror, Mr. Kees, "was too stupid to live much less be on a jury;" and that the prosecutor said, "[t]his system is a joke," before she provided her race neutral reasons for the use of a peremptory challenge on potential juror Mr. Ransaw.
Although defendant only challenges the comments made in connection with the above three potential jurors, the details regarding all nine Batson challenges are set forth below for purposes of completeness.[3]
Arianne Ingram
Ms. Ingram testified that she was unemployed, single, and had no children. She stated that she would not have to see the gun in order for the state to prove that the gun was possessed. Ms. Ingram said that she would not hold it against defendant if he or the prosecutor made objections during trial.
*777 After the prosecutor used three peremptory strikes, she stated that she wanted to go over her strikes just for the record: that the first juror she struck was Ms. Simon, a white female; that the second juror she struck was Mr. Moss, a white male; that the third juror she struck was Mr. Ball, a white male; and that the fourth juror she struck was Ms. Davis, a black female and her first strike against a black juror.
The prosecutor then used her fifth peremptory strike on Ms. Ingram. Defense counsel noted that Ms. Ingram was a black female and he asked for the reason for the strike under Batson. The prosecutor stated that there were two jurors who were selected who were black and, at that time, they had an all-black jury. The clerk told the trial judge that the prosecutor was correct. The trial judge said that he had listened to the strikes by both counsel on the peremptory side and that there were arguments on the strikes. He stated that he did not find that defendant had established a prima facie case of discrimination by the state in the exercise of the peremptory challenges at that point.
When defense counsel later made a Batson challenge on Ms. Hunter, the prosecutor told the trial judge what her reasons were for striking Ms. Ingram as well. The prosecutor stated that Ms. Ingram had "what I would call a do-rag on her head. She smiled a beautiful smile at John [defense counsel], wanted nothing to do with me, kept looking at defendant." After hearing the state's reasons for striking Ms. Ingram, and Ms. Hunter, he said, "[l]et's move to the next juror."
Laqueen Hunter
Ms. Hunter testified that she was a teacher and that she had two children. When the trial judge asked if anyone had any close friends or relatives employed by a law enforcement agency, Ms. Hunter stated that her uncle and her cousin both worked at the corrections center. She explained that they had not discussed this case with her, and that she would try to give both sides a fair trial and be impartial.
The trial judge asked her if she found defendant not guilty, would she be able to look her relatives in the eye and say that she did the right thing. Ms. Hunter responded affirmatively. The prosecutor asked the jurors if they would need to see the gun to prove that a gun was possessed. Ms. Hunter responded that she would need to see the gun because that would prove they got the gun from him and that it existed.
Ms. Hunter stated that she knew Ms. Ingram from the neighborhood, but that they did not socialize. Defense counsel asked the potential jurors whether there were any relationships they had that might influence them and make them believe that defendant is or is not guilty. Ms. Hunter explained that her husband had gotten out of jail, and that her son's father was in jail at the present time, and that she would lean to the defense side. She then stated that she would try to set that aside and that she would apply the law that the judge gave her.
The prosecutor challenged Ms. Hunter for cause, arguing that she had a brother-in-law in jail, her child's father was in jail, that she would lean toward the defense and, therefore, that she could not be a fair juror. The trial judge denied the challenge because he heard Ms. Hunter say that she could follow the law. The prosecutor used her sixth peremptory strike on Ms. Hunter. Defense counsel noted that this was the third black female in a row struck by the state. The prosecutor stated that they had an all-black jury.
*778 The trial judge said that, based on the arguments of counsel and the use of strikes, he did not find that defendant had established a prima facie case of discrimination in the exercise of the peremptory challenges. He also noted that the only two jurors they had at that point were black. However, he stated that he wanted the state to provide the race neutral reasons for the striking of this juror for the record.
The prosecutor explained that Ms. Hunter had two close family members in jail and that, although she disagreed with the court's denial of the challenge for cause, she did not believe that Ms. Hunter "would ever on any given day give the State anything remotely resembling a fair trial." The trial judge said that they were going to move to the next juror. Ms. Mitchell was subsequently seated as juror number 3, and the trial judge called up the second panel.
Barrye Bailey
Ms. Bailey testified that she was 25 years old, had no children, and was a full-time college student. She explained that her next-door neighbor worked for the St. Charles Parish Sheriff's Office, but that she could be fair and impartial to defendant. Ms. Bailey stated that she had a close friend from high school who was murdered approximately two years ago, but that experience would not prevent her from being fair and impartial in giving defendant a fair trial. She said that she thought the law that convicted felons could not carry weapons was a bad law because they would be unable to protect themselves. She subsequently explained that a person should not be able to carry a gun all the time, only if that person had a feeling that something might go wrong. When questioned by defense counsel, Ms. Bailey indicated that justification might be a defense, and that she could accept the law as given.
The prosecutor challenged Ms. Bailey for cause, explaining that Ms. Bailey believed that the statute defendant was being prosecuted for was a bad law, that a convicted felon should be able to carry a weapon, and that under the totality of the circumstances Ms. Bailey could not give the state a fair trial. Defense counsel disagreed with the prosecutor. The trial judge denied the challenge, noting that Ms. Bailey was rehabilitated sufficiently enough to overcome the challenge for cause.
The prosecutor used her seventh peremptory challenge to strike Ms. Bailey. Defense counsel noted that this was the fourth black female in a row who had been challenged by the state, and he asked for a Batson reason. The trial judge said that, based on all the testimony, specifically responses to questions by the panel members, he did not find that defendant had made his case. However, the trial court then asked the prosecutor to state her race neutral reasons.
The prosecutor said that she had already challenged Ms. Bailey for cause, and that her reasons for using the peremptory challenge were the same. The trial judge stated that those were sufficient race neutral reasons, and he allowed the state to use its peremptory challenge to exclude Ms. Bailey. Ms. Bradford, a black female, was subsequently seated as juror number 4, Ms. Armand was seated as juror number 5, Ms. Granier was seated as juror number 6, and Ms. Davis was seated as juror number 7.
Ishmeal Ransaw
Mr. Ransaw testified that he was married, had three children, was 60 years old, and retired from Monsanto. Mr. Ransaw stated that his son was a state witness in a murder trial in 1989, that his son was *779 convicted of possession of a firearm in 1989, that his son got approximately one year in jail time for that crime, that his son was approximately 19 or 20 years old when he was convicted, and that he did not believe his son was wrongly convicted.
Mr. Ransaw said that that would not affect him in any way in his being able to give the state a fair trial. He stated that he did not feel any sympathy toward defendant. The prosecutor asked Mr. Ransaw what he was reading, and he responded that it was a Bible handbook.
The prosecutor challenged Mr. Ransaw for cause, arguing that Mr. Ransaw's son was convicted of the same charge that defendant stood accused of, that his son got jail time, and that she did not think he could be fair in this case. The trial judge denied the challenge, noting that Mr. Ransaw said he could be fair to both sides.
The prosecutor used her eighth peremptory challenge to strike Mr. Ransaw. Defense counsel asked for race neutral reasons under Batson, arguing that this was the fifth black person that had been struck in a row. The following exchange then occurred:
MS. McELWEE [the prosecutor]:
Judge, I can't help it. This system is a joke. We have three or four that are black.
THE COURT:
How many do we have?
MS. McELWEE:
Three.
THE COURT:
Again, I stated for the record that a prima fascia [sic] case
MS. McELWEE:
How can I be striking a race if three of them are black, John [defense counsel]?
Defense counsel did not answer. The trial court subsequently stated that a prima facie case of discrimination had not yet been established by the defendant because of the particular answers given by all members of this panel to the questions of their opinions on whether or not a convicted felon should have hand guns. However, the trial court said that state could go on the record for "racial neutral reasons."
The prosecutor said that, in addition to the reasons she previously mentioned for Mr. Ransaw, i.e., the fact that his son was convicted of the same crime, possession of a firearm by a felon, and went to jail for it, that he also had a Bible handbook with him. The prosecutor stated that she believed that that (the Bible handbook) predisposed people to sympathy and the defense. The trial judge said that the state had given sufficient race neutral reasons, and that the peremptory challenge stood. He noted that that was the eighth peremptory challenge for the state.
Stephanie Dinvaut
Ms. Dinvaut testified that she was married and worked at Hahnville High. She stated that she had a first cousin who was in prison for armed robbery, but that it would have no bearing on her being impartial in this trial, and that she could give both sides a fair trial. The prosecutor asked Ms. Dinvaut whether she felt sympathy for defendant, and whether she felt like she could sit in judgment on his life. Ms. Dinvaut said she could; however, the prosecutor noted that Ms. Dinvaut seemed a little hesitant. Ms. Dinvaut again said she was sure.
The prosecutor used her ninth peremptory challenge to strike Ms. Dinvaut. Defense made a Batson challenge. The prosecutor asked defense counsel if he had ever read Batson and did he know what the case stood for. Defense counsel stated that this was the sixth black individual who *780 had been struck in a row by the state. The trial judge said he did not find a prima facie case of discrimination for the reasons he gave on the last objection (Mr. Ransaw). However, he asked the state to put its race neutral reasons on the record.
The prosecutor stated that Ms. Dinvaut's first cousin was convicted of robbery, and that she was dressed in a t-shirt that had "Crazy" written across the front of it. The trial judge found that those were sufficient race neutral reasons and allowed the state to use its peremptory challenge to exclude Ms. Dinvaut.
Cynthia Rainey
Ms. Rainey testified that she was married, had two children, and was a security guard. She stated that her brother had been convicted of armed robbery, and that it had happened in New Orleans approximately 20 years ago.
The prosecutor used her tenth peremptory challenge to strike Ms. Rainey. Defense counsel stated that this was the seventh black individual in a row who had been struck by the state, and he asked for race neutral reasons under Batson. The prosecutor said that Ms. Rainey's brother was convicted of armed robbery. The trial judge stated that, because of the peculiarity of this case and these panel members' responses to questions regarding a convicted felon being able to carry a gun to defend himself, he did not find a prima facie case of discrimination yet established against the state.
However, the trial judge asked the prosecutor to tell him her reasons for the record. The prosecutor stated that Ms. Rainey's brother was convicted of armed robbery and that she believed Ms. Rainey would be sympathetic to the defendant. The trial judge said that that alone was a sufficient race neutral reason for the state to exercise its peremptory challenge. He noted that that was the tenth peremptory challenge for the state. The state and the defense subsequently accepted Ms. Lind as juror number 8, and the trial court noted that she was a black juror. Ms. Richard was seated as juror number 9, and Noah Wiltz, a black male, was seated as juror number 10.
Marvin Taylor
Mr. Taylor testified that he was married with two children. He stated that he did not think that all United States citizens should be able to keep a gun on them at all times, but sometimes a citizen might need something to protect themselves with. Mr. Taylor said he agreed with Ms. Bailey: that if a person goes into a bad neighborhood, that person might need some protection and should be able to take a gun.
The prosecutor used her eleventh peremptory challenge on Mr. Taylor. Defense counsel said that this was the eighth black individual who had been struck in a row by the prosecution, and he asked for race neutral reasons. The trial judge said again that he had not changed his mind and that he did not find a prima facie case of discrimination yet established by the defense against the state. However, he asked the state to give its race neutral reasons for the record. The prosecutor stated:
I don't like the way he's dressed. He looks like a drug dealer to me. And, in response to my question about the law of 95.1, his answer suggested that the Defense should be expanded, people should be able to carry guns more often for protection, which is exactly what the Defense is going to contend in the case.
The trial judge stated that those were sufficient race neutral reasons for the state to use a peremptory challenge. Ms. Brevelle was subsequently seated as juror number 11.
*781 Henry LeBoyd
Mr. LeBoyd testified that he was married, had two children, and was the community relations manager at the Orion Refinery. Mr. LeBoyd explained that he would be better off if law enforcement authorities caught him with a gun, rather than to have a bad guy catching him without one. When asked by defense counsel if it was more likely than not that defendant was justified in possessing a firearm, Mr. LeBoyd said that his verdict would be that defendant was innocent of the charges against him.
When Mr. LeBoyd's name was presented as a potential juror, the prosecutor stated that she wanted to re-urge her challenge for cause, arguing that Mr. LeBoyd had said that he would rather get caught with a gun so that he could have it for protection and deal with that than to follow the law. She added that Mr. LeBoyd had said that he would personally not follow the law himself. Defense counsel explained that that matter had been cleared up on rebuttal when Mr. LeBoyd said that he could follow the law as given to him and that he could be impartial to both sides. The trial judge stated that he would not change his mind.
The prosecutor used her twelfth peremptory challenge on Mr. LeBoyd. Defense counsel said that was the ninth, maybe the tenth, black individual in a row in a pool that was made up of a majority of white individuals, and he asked for Batson race neutral reasons. The trial judge stated that he did not find a prima facie case of discrimination yet established despite the challenges. He found that the state's reasons were sufficiently race neutral, and he allowed the state to use a peremptory challenge to exclude Mr. LeBoyd. The state and the defense then accepted Bernadette Blue, who was seated as juror number 12. The trial judge called up the third panel of potential jurors.
Keiana Dent
Ms. Dent testified that she was unemployed, single, and had one child. The prosecutor used a peremptory challenge to strike Ms. Dent. Defense counsel said that that was the tenth black individual who had been struck in a row by the state, and he asked for a race neutral reason. The trial judge asked the prosecutor for her race neutral reasons. The prosecutor stated that Ms. Dent was unemployed and looked like she was not interested in being there. The trial judge allowed the state to use a peremptory challenge to exclude Ms. Dent.
In addition to the above Batson challenges, defendant also noted that the state made unprofessional comments during a challenge for cause on potential juror Dennis Kees.
The record reflects that Mr. Kees testified that he was married, had three children, and was a self-employed painter. He stated that he disagreed with the law that a convicted felon could not possess a weapon. Mr. Kees later said that he agreed with the law now that the prosecutor had told him the whole law (regarding justification as a defense for a convicted felon to possess a weapon). Defense counsel asked Mr. Kees if he wanted to be there. Mr. Kees said he did not want to be there, but he was "okay with it."
Defense counsel challenged Mr. Kees for cause. He stated that Mr. Kees came to court with a hat on, that Mr. Kees and the prosecutor had a history together, that Mr. Kees had tried to be excused earlier because of some misdemeanors he pled guilty to, and at first he said he would not follow the law. The prosecutor said, "I don't have an objection. He's too stupid to live much less be on a jury." The trial judge granted the challenge for cause. The *782 prosecutor subsequently told the trial judge that she had prosecuted Mr. Kees recently for child abuse.
On appeal, defendant concedes that the state gave reasons unrelated to race during his Batson challenges. Further, he does not brief or argue that those reasons were not race neutral. Rather, defendant argues that the state's comments indicated that she had a racial bias and was not sincere in the reasons given. Therefore, the issue on appeal is whether the state's comments during voir dire showed a lack of sincerity in the race neutral reasons given, and whether her comments impaired defendant's ability to get a fair trial.
Under Batson, a defendant objecting to a peremptory challenge must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used the challenges to exclude potential jurors on account of race. The burden of production then shifts to the prosecutor to come forward with a race-neutral explanation for the challenges. The explanation need not be persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered may be deemed race-neutral. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) Purkett, supra. The trial court then must decide whether the defendant has proved purposeful racial discrimination. State v. Collier, 553 So.2d 815, 818 (La.1989). The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
The proper inquiry in the final stage of the Batson analysis is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, 782, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000). The trial judge's determination of purposeful discrimination rests largely on credibility evaluations, and these findings are entitled to great deference by the reviewing court. Batson, 476 U.S. at 99 n. 21, 106 S.Ct. 1712.
No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venire persons has emerged during voir dire but also whether "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498, 501, 502 (quoting Batson v. Kentucky, 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986)). Batson accords a trial court considerable flexibility and broad discretion in this regard because "trial judges, experienced in supervising voir dire, will be able to decide if circumstances concerning a prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Batson, supra, 106 S.Ct. at 1723.
In State v. Jacobs, 99-991 (La.5/15/01), 803 So.2d 933, 941-944, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002), defendant argued that he proved discriminatory intent in the final six peremptory challenges made by the prosecutor, when the proffered race-neutral reasons were weighed against the totality of the circumstances. In Jacobs, Tracy Moton, *783 a 22-year-old single mother of a seven-week-old infant, was the seventh juror excused peremptorily by the prosecutor. Initially, her voir dire responses suggested that jury service would pose a hardship for her because of her baby, but then her tone shifted to indicate that she would have no concerns about leaving her infant in the care of others while she served on a sequestered jury.
In justifying his exercise of a peremptory challenge to excuse Ms. Moton, the prosecutor explained that Ms. Moton was a single mother who apparently had no sense of responsibility to her infant child since she was willing to let another family member care for the child while she stayed in a hotel, locked up and sequestered. The prosecutor thought that Ms. Moton's behavior was "shocking," and that if Ms. Moton could not assume responsibility for her own child, she could not hold defendant responsible for his actions.
Defendant argued that the explanation was "patently racist (and sexist)," as it called forth the stereotype that young, single black mothers were poor, uncaring parents. Citing Hobley, 752 So.2d at 783, defendant contended that a more exacting scrutiny was required when cultural classifications might serve as a proxy for an impermissible classification.
The supreme court found that the prosecutor did not single out Ms. Moton's ethnicity as a basis for excusing her, but rather inquired strongly into the effect on her jury service of having a seven-week-old child at home. It concluded that there was no indication in the voir dire, as a whole, that race dictated the prosecutor's decision to strike Ms. Moton, and that the judge did not abuse his discretion in accepting the prosecutor's explanation.
In the instant case, the evidence does not support defendant's contention that the state's comments indicated a racial intent. The record reflects that the state did not make any racial comments during voir dire, opening or closing statements, nor during the questioning of witnesses and the introduction of evidence at trial. Additionally, the record reveals that the twelve-person jury was comprised of five African-American jurors,[4] a substantial number and almost one-half of the jury.
Although the prosecutor said during voir dire that "this system is a joke," she was apparently frustrated, since at the time she said it, three of the seven jurors already chosen were African-American, almost one-half of the jury at that time. Therefore, we find that the comment was not racial when taken in context.
Defendant argues that the state's comments that she did not like the way Mr. Taylor was dressed and that he "looked like a drug dealer" were racial and biased. However, as was discussed previously, the record as a whole does not indicate that the state was biased against African-Americans. Additionally, this Court has held that the manner of dress is an acceptable race neutral reason for excluding a potential juror. (See, State v. Banks, 96-652 (La.App. 5 Cir. 1/15/97), 694 So.2d 401, 408, where the prosecutor stated that he was excluding a potential juror because, inter alia, he was wearing gold jewelry and dressed in a T-shirt).
Further, the prosecutor also stated that she wanted to exclude Mr. Taylor because his answers indicated that he thought people should be able to carry guns more often for protection, which was exactly what the defense was going to contend.
*784 Therefore, it appears that the state's reasons for excluding Mr. Taylor were race neutral.
Defendant also objects to the prosecutor's statement that Mr. Kees "was too stupid to live much less be on a jury." However, the record indicates that the prosecutor had recently prosecuted Mr. Kees for child abuse. Although the comment may have been unkind, it does not appear that it was racial, considering the history between the prosecutor and Mr. Kees.
In light of the foregoing, we conclude that the trial judge did not err in denying defendant's Batson challenges. Further, we fail to find that the prosecutor's comments during voir dire indicate that she was racist or biased against African-Americans.
This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
The jury's guilty verdict was against the weight of the evidence presented in trial since the evidence clearly showed that Crawford was a frightened victim who had been car jacked moments earlier and was being pursued by two unknown gunmen at the time of his arrest.
DISCUSSION
Defendant argues that there was insufficient evidence to support his conviction of illegal possession of a firearm by a convicted felon. He does not dispute that he was a convicted felon who possessed a firearm within ten years of his prior conviction. Instead, defendant maintains that he was justified in grabbing the gun from another man during a struggle, and that he kept the gun after he fled because he believed that his life was in danger.
The record does not show that defendant filed a motion for post-verdict judgment of acquittal pursuant to LSA-C.Cr.P. art. 821. However, such failure does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La.1982).
The constitutional standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) requires that a conviction be based on proof sufficient for any rational trier of fact, viewing all of the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See, State v. Bishop, 01-2548 (La.1/14/03), 835 So.2d 434, 437.
Defendant was convicted of violating LSA-R.S. 14:95.1, which makes it unlawful for any person who has been convicted of certain felonies to possess a firearm. The elements necessary to sustain a conviction under LSA-R.S. 14:95.1 are (1) the status of defendant as a convicted felon; (2) possession by the defendant; and (3) the instrumentality possessed was a firearm. State v. Mose, 412 So.2d 584, 585 (La.1982); State v. Knight, 99-138 (La. App. 5 Cir. 6/30/99), 738 So.2d 1179, 1181. General intent is required to commit the crime. State v. Wilder, 02-229 (La.App. 5 Cir. 6/26/02), 822 So.2d 844, 848, writ denied, 03-405 (La.2/13/04), 867 So.2d 683. The state must also prove that ten years has not elapsed since the date of completion of the punishment for the prior felony conviction. State v. Knight, supra at 1181.
As was stated previously, defendant does not challenge that he was a convicted felon who possessed a weapon within ten years of his prior conviction. Rather, he argues that he was justified in possessing that weapon because his life was in danger as he was being pursued by two unknown gunmen.
The defense of justification is found in LSA-R.S. 14:18. It states in pertinent part:

*785 The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
....
(6)When any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed[.]
In State v. Blache, 480 So.2d 304, 308 (La.1985), the supreme court concluded that a felon may justifiably possess a weapon for self-defense in situations as follows:
We hold that when a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such situation justification is a defense to the charge of felon in possession of a firearm.
This is not to say that a convicted felon is entitled to own or maintain possession of a weapon, constructive possession or otherwise, for protection, or for any other reason.
In order to prove the defense of justification, defendant must show he was in imminent peril of great bodily harm, or reasonably believed himself or others to be in such danger. If so, then he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. Blache, 480 So.2d at 308.
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. LSA-R.S. 14:21.
Justification is an affirmative defense which the accused must establish by a preponderance of the evidence. State v. Cheatwood, 458 So.2d 907 (La.1984).
In tending to establish the defense of compulsion, an appellate court must determine whether a rational trier of fact could have concluded by a preponderance of the evidence, viewed in the light most favorable to the prosecution, that the defendant's criminal actions were not compelled. State v. Barnes, 489 So.2d 402 (La.App. 5 Cir.1986), writ denied, 494 So.2d 1174 (La.1986).
Defendant states in his brief that, "[a] defendant who asserts self-defense in a homicide case does not assume any burden of proof on that issue; and the state has the affirmative duty of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense." However, it is noted that this law is inapplicable to the instant case, because the instant case does not involve a homicide.
In the instant case, the record supports the jury's apparent conclusion that defendant was not reasonably justified in possessing a gun. The evidence indicates that defendant was not in imminent peril of death or great bodily harm when the officers found the gun on defendant's person. When defendant traversed the cane fields for approximately one and a half miles, he did not look behind him, arguably because he knew no one was chasing him.
*786 The officers saw defendant on the bridge walking, not running. They did not see anyone else on the bridge or in the vicinity of the bridge. Defendant did not flag down the police car or ask for help when the officers stopped. In fact, according to the officers' testimony, defendant reached for the gun while he was on the bridge. Defendant did not dispose of the gun in the cane field or over the side of the bridge when he had the opportunity to do so.
Although defendant testified that he kept the gun because he feared for his life, the jury evidently rejected defendant's version. According to the officers, defendant told several different versions regarding what had occurred relative to the alleged carjacking. Further, defendant could not name the friend he was with on the night in question, give a description of the car he was riding in prior to the alleged carjacking, or state where their ride initiated from.
After hearing the trial testimony, the jury chose to accept the testimony of the state's witnesses and reject defendant's testimony.
The trier of fact shall evaluate the witnesses' credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Rivers, 01-1251 (La. App. 5 Cir. 4/10/02), 817 So.2d 216, 219, writ denied, 02-1156 (La.11/22/02), 829 So.2d 1035. It is not the appellate court's function to reevaluate the credibility choices by the fact finder. State v. Spencer, 93-571 (La.App. 5 Cir. 1/25/94), 631 So.2d 1363, 1370, writ denied, 94-488 (La.2/3/95), 649 So.2d 400.
Consequently, after viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found, beyond a reasonable doubt, that the evidence was sufficient to support the conviction. Additionally, for the reasons stated previously, we find that the evidence was sufficient to conclude that defendant's possession of a firearm was not justified.
This assignment has no merit.
ASSIGNMENT OF ERROR NUMBER THREE
The district court erred in imposing the maximum sentence against Crawford despite the fact that the evidence indicated that the reason Crawford was convicted was simply because he disarmed his assailant and used the weapons as protection from two men who were trying to kill him following a car jacking in an unfamiliar neighborhood.
DISCUSSION
Defendant argues that his maximum 15-year sentence is constitutionally excessive. He contends that he should not have been given the maximum sentence just because he was in possession of his assailant's handgun.
On February 13, 2003, prior to sentencing, the trial judge asked defendant if he wanted him to consider any mitigating circumstances other than a letter from defendant he had reviewed. Defendant requested leniency based on the fact that he had a seven-year-old daughter that he had only seen for 16 months, and that he wanted to be home to see his daughter graduate from high school. He also said that a guilty man had walked away and that an innocent man was convicted.
The trial judge stated that he had sat through the trial and heard all the evidence, and that the jury was unanimous in its decision to convict defendant. The trial judge found that: (1) there was an undue risk that during the period of suspended sentence or probation, defendant would commit another crime; (2) defendant *787 was in need of correctional treatment or a custodial environment that could be provided most effectively by his commitment to an institution under the control of the Department of Corrections; and (3) a lesser sentence than the one he was going to give defendant would deprecate the seriousness of this particular crime.
The trial judge found the following aggravating factors: (1) defendant was in possession of a firearm after being previously convicted of manslaughter; (2) another individual in this case, although he was not an individual of good character, was shot twice with a weapon that was found in defendant's possession; and (3) defendant had a prior conviction for manslaughter. The trial judge said he would take into account the fact that defendant had a daughter.
Defendant stated that he was in prison for approximately five years when he agreed to a plea bargain in another case. He said that he did so, not because he was guilty, but because he wanted to be home with his daughter and his family. Following this discussion, the trial judge sentenced defendant to imprisonment at hard labor for 15 years without benefit of parole, probation, or suspension of sentence. He also ordered defendant to pay a fine of $1,000, which he subsequently suspended.
Defendant failed to file a motion to reconsider sentence under LSA-C.Cr.P. art. 881.1. The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. State v. Hester, 99-426 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342. Accordingly, defendant's sentence is reviewed only for constitutional excessiveness.
Defendant asserts that he was denied his right to contest the excessiveness of the sentence because the trial judge did not advise him of the time period for filing a motion. However, this Court does conduct a review of the sentence for constitutional excessiveness absent a motion. See, State v. Hester, supra.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Munoz, 575 So.2d 848, 851 (La.App. 5 Cir.1991), writ denied, 577 So.2d 1009 (La.1991). Even a sentence which falls within statutory limits may be excessive under certain circumstances. State v. Short, 00-866 (La.App. 5 Cir. 10/18/00), 769 So.2d 823, 831, writ denied, 00-3271 (La.8/24/01), 795 So.2d 336.
In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice, recognizing at the same time the broad discretion afforded the trial judge in determining and imposing sentence. State v. Puckett, 02-997 (La.App. 5 Cir. 1/28/03), 839 So.2d 226, 234, writ denied, 03-891 (La.12/12/03), 860 So.2d 1148. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Id.
Defendant was convicted of possession of a firearm by a convicted felon in violation of LSA-R.S. 14:95.1. Whoever is found guilty of violating the provisions of this Section shall be imprisoned at hard labor for not less than ten nor more than fifteen years without the benefit of probation, parole, *788 or suspension of sentence and be fined not less than $1,000 nor more than $5,000. LSA-R.S. 14:95.1(B). Defendant received the maximum imprisonment term.
Courts have found that the following sentences were not constitutionally excessive for defendants convicted of violations of LSA-R.S. 14:95.1: State v. Brooks, 03-391 (La.App. 5 Cir. 9/16/03), 858 So.2d 74 (15-year sentence; the trial judge found the following aggravating factorsdefendant was on probation for another offense at the time of the offense; defendant was deliberately cruel toward the victim; defendant inflicted significant injuries; and he put the safety of people in jeopardy; the trial judge did not find any mitigating circumstances); State v. Jones, 01-539 (La.App. 3 Cir. 10/31/01), 799 So.2d 772, writ denied, 01-3310 (La.12/13/02), 831 So.2d 975 (15-year sentence without parole, probation, or suspension of sentence, plus $1,000.00 fine; defendant argued with homeowner and her fiancé and then returned repeatedly to argue with homeowner until he finally returned with a gun and threatened homeowner; the trial court noted that defendant had five previous felony convictions, was an undue risk, and would continue to commit crimes if he was not incarcerated; the trial court also noted that there were no mitigating factors, defendant had no remorse for his crime, and a lesser sentence would deprecate the seriousness of the crime); State v. Felder, 36,228 (La.App. 2 Cir. 8/14/02), 823 So.2d 1107 (12-year sentence without benefit of parole, probation or suspension of sentence; trial court said that sentence was below the mid-range of sentencing limits, and it considered defendant's prior criminal history, including previous felony and misdemeanor convictions admitted at trial); State v. Brooks, 99-478 (La.App. 3 Cir. 12/8/99), 756 So.2d 336, writ denied, 00-1492 (La.5/25/01), 792 So.2d 750 (12-year sentence; pre-sentence investigation report indicated that defendant's criminal history included over 35 different charges); and State v. Dabney, 01-1110 (La.App. 3 Cir. 6/25/03), 848 So.2d 784 (ten-year sentence plus $1,000 fine; defendant received minimum sentence, was a second felony offender and on probation at time he committed the offenses).
In the instant case, the record reflects that defendant had previous convictions for aggravated battery and manslaughter, both crimes of violence under LSA-R.S. 14:2. Defendant conceded that the gun that was found in his possession was the same gun that was used to shoot Mr. Williams. Additionally, defendant admitted being present during the exchange of drugs between Mr. Williams and "Black." Considering defendant's recidivist tendencies and past history of violent crime and the jurisprudence, we fail to find that the trial judge abused his discretion in sentencing defendant to the maximum term of imprisonment, and that defendant's sentence was not constitutionally excessive.
This assignment is without merit.
ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals one error patent which is in need of correction.
During sentencing, the trial judge failed to advise defendant of the prescriptive period for post-conviction relief, as required by LSA-C.Cr.P. art. 930.8, which provides that a court shall not consider an application for post-conviction relief filed more than two years after the judgment of the conviction and sentence has become final. Therefore, we remand the case with instructions to the trial court to send written notice to defendant of the provisions of *789 LSA-C.Cr.P. art. 930.8. State v. Fairley, 02-168 (La.App. 5 Cir. 6/26/02), 822 So.2d 812, 817. In all other respects, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED CASE REMANDED WITH INSTRUCTIONS.
NOTES
[1] The forensic analysis report contained in the record indicates that a gunshot residue test was conducted on Mr. Williams, and that the "findings were consistent with someone having discharged a firearm, having been in the vicinity of a discharging firearm, or having touched an object upon which gunshot residues were deposited."
[2] The forensic analysis report indicates that a gunshot residue test was done on defendant. The report stated that it was "indeterminate if the subject has discharged a firearm. However, this does not exclude the possibility that the subject could have discharged a firearm and no gunshot residues were deposited on the hands; nor does it exclude the possibility that gunshot residues may have been deposited on the hands and were removed by washing or wiping before the specimens were obtained."
[3] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[4] Juror number 1, Ms. McCleland; Juror number 2, Mr. Colly; Juror number 4, Ms. Bradford; Juror number 8, Ms. Lind; Juror number 10, Mr. Wiltz.