901 So.2d 533 (2005)
STATE of Louisiana
v.
Michael FASOLA.
No. 04-KA-902.
Court of Appeal of Louisiana, Fifth Circuit.
March 29, 2005.
*535 Charles C. Foti, Jr., Attorney General, Kristi D. Hagood, Assistant Attorney General, Louisiana Department of Justice, Baton Rouge, Louisiana, for Plaintiff/Appellee.
M. Michele Fournet, Baton Rouge, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY and CLARENCE E. McMANUS.
MARION F. EDWARDS, Judge.
Defendant, Michael Fasola, appeals his conviction for second degree murder. For *536 the following reasons, we affirm the defendant's conviction and remand to correct an error patent on the face of the record.
On July 24, 2001, defendant, Michael Fasola, was indicted by a St. Charles Parish grand jury for the first degree murder of Jon Springman in violation of LSA-R.S. 14:30. The State subsequently amended the indictment to charge Fasola with second degree murder. Fasola pled not guilty to the original and to the amended indictment. Fasola filed a motion to suppress his statement, and the matter was heard on July 24, 2002, September 5, 2002, and October 7, 2002. At the conclusion of the hearing on October 7, 2002, the trial judge took the matter under advisement. The trial judge denied the motion on December 4, 2002, and later rendered oral reasons. Fasola sought supervisory relief from this Court, which was denied on March 28, 2003.
Fasola proceeded to trial on April 14, 2003 before a twelve-person jury, which returned a verdict of guilty as charged by a vote of 11-1. On May 6, 2003, the trial court denied defendant's motions for new trial and motions for post-verdict judgment of acquittal. Thereafter, the trial judge sentenced Fasola to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This timely appeal follows.
On September 7, 1999, sixteen-year-old Jon Springman disappeared from his apartment in Jefferson Parish, where he had resided with Fasola and another roommate, Jason Delormier, for approximately three weeks prior to his disappearance. Mrs. Springman testified that her son moved into the apartment against her wishes. Delormier was Springman's high-school friend, but she did not become acquainted with Fasola until after her son moved into the apartment. Mrs. Springman testified that her son had a drug problem starting when he was fourteen years old. He was in a rehabilitation center from August 1998 until November 1998, but continued to use drugs thereafter. Before going into rehabilitation, he stole several thousand dollars from her. Just before he disappeared, Springman charged $1,260.00 on her credit card without her permission and was badgering her for $300.00, which she refused to give him.
Mrs. Springman last spoke to her son at 6:00 p.m. on September 7, 1999, and he did not return her pages from that time forward. Delormier called on September 8, 1999, looking for him. Delormier said he had not been at the apartment the night before. When Mrs. Springman spoke to Fasola, he said that when he left the apartment on September 7, Springman was watching television on the couch. Defendant also said, "boy, you know I hope nobody did anything like killed him."
The Jefferson Parish Sheriff's Office initiated a missing person's investigation when Mrs. Springman reported him missing. Lieutenant Michael Alwert and Detective Hymel of the Jefferson Parish Sheriff's Office assisted in the missing person's investigation. Fasola gave a statement to Lieutenant Alwert on September 29, 1999. Fasola said he last saw Springman when he returned to the apartment after getting off of work at approximately 5:30 p.m. Springman was playing a video game. Fasola said that he and Larry Cochran went to the lakefront near West End at 6 p.m. to "hang out." After bringing Cochran home, Fasola met his parents at a restaurant in Metairie to celebrate his mother's birthday.
Springman's disappearance remained unsolved until March 2001. On March 13, 2001, the St. Charles Parish Sheriff's Office received a call about human skeletal remains that were discovered in Montz, Louisiana, approximately one mile or less *537 west of the Spillway. Henry Rocker saw the remains in a cavity of a support structure of I-10 when he was at the Spillway to spray paint graffiti and to fish. The St. Charles Parish Sheriff's Office excavated the remains from the cavity, which was at least twelve feet deep.
By comparing Springman's dental records with the jaw bones and teeth of the skeleton, a forensic odontologist determined that the skeleton was the remains of the victim, Jon Springman. It was also determined that a pager that was located in the cavity was registered to Springman's mother. According to Dr. Mary Manheim, a forensic anthropologist at Louisiana State University, Springman had been dead for somewhere between nine months and three years. Dr. Manheim found evidence of a gunshot wound in the skull. According to Dr. Manheim, the entry wound was in the skull's left temporal region and the exit wound was in the right frontal region. Dr. Manheim found another area of trauma to the skull in the right parietal region that indicated blunt force trauma that occurred at or around the time of death. This injury was consistent with a boulder or heavy object being dropped on the individual's head.
What was formerly a missing person's investigation became a homicide investigation. The St. Charles Parish Sheriff's Office requested assistance from Lieutenant Alwert, since he had been on the original missing person's investigation. Lieutenant Alwert worked with St. Charles Parish Detective Chad Robichaux in the homicide investigation. Lieutenant Alwert testified that they interviewed Jude Brandstetter, who initially denied any knowledge of Springman's death. However, Brandstetter ultimately gave a statement implicating Fasola. At trial, Brandstetter testified that he has known defendant since he was a teenager and met Springman through Fasola. Brandstetter testified that Fasola told him that he and Delormier were going to Arkansas because the police were harassing them. He also told Brandstetter that he shot and killed Springman from behind with a pistol one day when he and Springman were shooting guns and smoking marijuana. Fasola said he put the body in a hole and threw rocks on it. According to Brandstetter, Fasola asked him to help him move the body because he was afraid that Cochran was going to "rat on him." Brandstetter said that Fasola did not implicate Cochran in the shooting, but that he said Cochran knew the body's location. Brandstetter said he revealed this information to another friend, Terry Blackwell, but that he did not go to the police.
After Alwert and Robichaux interviewed Blackwell and Brandstetter, Robichaux prepared a warrant for defendant's arrest. Before the warrant was processed, Cochran learned the police were looking for him and came to the detective bureau where he gave a statement, which was added to the warrant. At trial, Cochran testified that he initially denied knowing anything, but told the officers the truth. Cochran testified that he was sixteen years old in 1999. He testified that he and Fasola were childhood friends. On September 7, 1999, school let out at 2:45 p.m. Afterwards, he went to Fasola's apartment and waited for Fasola to come home. He did not recall whether or not he had arranged to meet defendant, but he stated that he frequently went to the apartment after school. Springman was at the apartment. When defendant came home, he suggested that they go to the Spillway to shoot guns. Fasola had a shotgun and a .38 revolver. They smoked some marijuana before leaving and brought some with them to smoke in the car. Fasola drove the trio to the Spillway. Cochran said he and defendant had shot guns in Arkansas together, but *538 that he had never been to the Spillway to shoot with defendant before.
After Fasola stopped the car near the levee, they all walked to a railroad trestle and down the railroad tracks. They walked until they reached a place where the Interstate was over them. They stood on top of a cement platform near the support columns and shot the guns in the direction of the lake. Defendant had the .38 and Springman and Cochran alternated firing the shotgun; however, neither he nor Springman fired the .38. After shooting for approximately half an hour, they ran out of shotgun shells. Fasola remarked that it was time to go home, since they were out of shells. Cochran was walking in front of the platform, with Springman and defendant behind him. After hopping down from the platform, Cochran heard a loud "pop." He turned to see Springman's body "fall motionless." Springman was lying on the platform near the hole and did not fall completely off the platform and had a hole in his head above his eye. Fasola was hyperventilating. Cochran "freaked out" and started screaming. He then saw Fasola drop the gun. Cochran ran to the gun, unloaded and dropped it. He went to the car, where Fasola appeared between nine and eleven minutes later. Defendant had a white T-shirt full of blood that he stuffed in the driver side door of the car. Fasola said, "I know you won't say anything because you're a friend[.]" Cochran took this remark as a threat. He did not ask about what happened because he was afraid. Thereafter, Fasola drove him home.
Cochran denied having any conversations with Fasola about planning to do anything to the victim. He also denied that he killed Springman, that he helped to get rid of the body, or that he threw anything on top of the body. Cochran said that the last time he saw Springman's body, it was lying on the cement platform.
Cochran testified that after the shooting, his emotional state rapidly deteriorated. He was afraid of Fasola and bought a gun for protection. He continued to socialize with Fasola because he did not want defendant to think he would tell on him. However, Cochran said that he was still very afraid and moved to Mandeville, where he became a full-blown drug addict.
Cochran testified that he was originally arrested for second degree murder. When the evidence was presented to the grand jury, however, he was indicted for accessory after the fact of first degree murder, which was still pending at the time of trial. He denied any promises or deals had been made with him in connection with his trial testimony.
After obtaining a warrant for defendant's arrest, Alwert and Robichaux went to Arkansas to find Fasola. With the assistance of the Arkansas State Police, they located him at the Little Rock Children's Hospital with his girlfriend, Brandi Marks, and their nine-month-old daughter. The Arkansas State Troopers apprehended Fasola and transported him to headquarters. Alwert and Robichaux followed in a separate vehicle. Marks drove herself and the child to headquarters.
While at headquarters, Alwert told Fasola that he could make a statement if he wanted to; otherwise, it would be a matter of extraditing him to Louisiana to face the charges because they had a warrant for his arrest. Alwert testified that he found defendant's demeanor to be "irritating." Alwert testified that he wrote "refused" at the bottom of the form where defendant would normally sign. Alwert told him, "this is how much I need your statement," crumpled up the form, threw it into the garbage, and left the interview room. Alwert *539 testified the defendant had not signed a rights form before he left the room.
Robichaux testified that he had motioned for Alwert to leave the room because defendant's and Alwert's personalities were clashing. After Alwert left, Robichaux apologized for Alwert's behavior. Robichaux testified that he told Fasola that he did not need his confession, but that it would be in his best interests to tell his side of the story. Fasola then agreed to waive his rights, and signed the St. Charles Parish waiver of rights form.[1] After a brief discussion of the circumstances, Robichaux went to get Alwert, who had been gone for approximately fifteen minutes.
Alwert testified that when he re-entered the room, the atmosphere in the room had changed. It was evident to Alwert that Robichaux had established a rapport with Fasola. Robichaux testified that Fasola signed another waiver of rights form, which was witnessed by Alwert. After a pre-interview, which was not recorded, defendant gave a recorded statement. In the statement, Fasola admitted that he killed Springman because Springman had approached defendant to kill Springman's mother. According to Fasola, Springman said that he would inherit a lot of money when his mother died because she owned three houses. Defendant said that Springman told him that he could have one of the houses and half of the money if he killed her. Fasola said Springman had concocted a plan for the murder. Defendant said that Springman wanted the house burned while she was inside. Defendant said he could not recall whether he wanted him to shoot her and then burn the house, but that Springman wanted the house burned so that the evidence would be destroyed. Springman also told him how he had stolen thousands of dollars from her. Initially, Fasola thought Springman was joking, and said he would do it. After Springman brought it up repeatedly, Fasola told Springman that he could not do it. Defendant said Springman's mother was very sweet and that he could not kill her.
Fasola said that he told Larry Cochran about the discussion with Springman. Fasola told Cochran that something should be done before Springman harmed his mother. The next day Springman wanted to go shooting guns at the Spillway. They brought a.38 gun and a 12 gauge shotgun. After smoking some marijuana at the Spillway with Cochran and Springman, Fasola decided that something had to be done about Springman. Defendant said that Cochran was walking the other way and Springman was sitting on the edge of the cement platform underneath the I-10. Defendant made sure that Cochran was not looking and then shot Springman in the back of the head with the .38. Fasola said that he shot Springman in the head because he did not want him to suffer. Fasola said that Springman fell forward and slid down partially onto the rocks. Afterwards, Fasola pulled Springman up onto the platform and threw him into the hole. Defendant said that Cochran did not help him dispose of the body, but did throw the bloody rocks into the hole. According to defendant, Cochran helped him to throw a tire that was filled with cement and a car bumper on top of the body. Defendant said that afterwards he removed his camouflage shirt, and wiped down everything to remove fingerprints and blood spatters. This statement was admitted into evidence and played for the jury.
*540 After Fasola confessed, Alwert and Robichaux interviewed defendant's girlfriend, Brandi Marks. At trial, Marks said she was either seventeen or eighteen in 1999, and that she and defendant had dated intermittently since she was thirteen years old. A couple of weeks after Springman disappeared, she asked Fasola what happened to Springman. Specifically, she asked defendant if he "did it," and defendant answered "[y]es." Defendant also told her that he shot Springman in the back of the head and that Cochran was with him. She said she did not know why Fasola killed Springman. However, she said that she knew Springman wanted his mother dead.
Fasola was indicted by a grand jury in April 2001. After Marks testified at this grand jury proceeding, a sexual relationship began between Marks and Robichaux, who was twenty-seven years old at the time of trial. Robichaux testified that the relationship lasted for approximately two weeks but they continued to talk for a period of time thereafter. It was established through cellular phone records that the affair's duration was approximately three weeks. Detective Robichaux concurred with this time frame. Robichaux acknowledged that he had a meeting at night with Kim McElwee in a shopping mall parking lot to admit the affair with Brandi Marks.
On June 28, 2001, Robichaux received a message from the supervisor at the correctional facility that Fasola wanted to speak to him regarding information in another case. After Fasola signed a waiver of rights form, he made a tape recorded statement that Jude Brandstetter had committed a murder in Hammond, Louisiana. He said he saw Brandstetter's statement in the police report, and he could not believe that his friend had "ratted him out on this murder." As a result, Fasola wanted to rat his friend out. After defendant's remarks about Brandstetter, Robichaux turned the conversation toward the Springman matter. Fasola motioned for Robichaux to turn off the recorder. Thereafter, Fasola said he and his attorney had designed a plan to file motions to exclude the confession. Specifically, Fasola said that he and his attorney believed his rights were violated because no one else was in the room other than Robichaux. Defendant also remarked that Robichaux had done a good job in the report and with the statements he had taken. Robichaux attempted to verify the information Fasola provided regarding Brandstetter to no avail.
Fasola was again indicted by a grand jury in July of 2001. Marks explained that a new grand jury was empaneled because one of the jurors from the first grand jury came to her work and harassed her. Twenty-one-year-old Jason Delormier also testified at the grand jury proceeding.[2] While waiting to testify before the grand jury, Delormier was placed in a jail cell with defendant. Delormier testified Fasola told him he was going to say he was coerced in his statement by the officers in Arkansas and wanted Delormier to say that the police coerced him, too. Fasola said that other witnesses would go along with them, and that defendant would help him out if he helped out defendant.
Delormier also testified that, on the way to Arkansas, Fasola admitted he shot Springman in the head after an argument in which Springman pointed the shotgun at him.
*541 In his first assignment of error, Fasola contends that the trial judge improperly denied his motion to suppress. According to Fasola, the trial judge abused his discretion in believing the testimony of Alwert and Robichaux because there were inconsistencies between the two officers' testimony, as well as internal inconsistencies within each officers' testimony.[3] The State responds that the trial court properly denied the motion to suppress because defendant validly waived his constitutional rights before giving the statements.
Defendant filed a motion to suppress the March 2001 confession on the basis that it was the product of police interrogation subsequent to defendant's invoking his right to counsel.[4] At the beginning of the hearing on the motion to suppress, the motion was enlarged to include the defendant's June 28, 2001 statement.
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[5] rights, that he voluntarily and intelligently waived his rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises.[6] In reviewing the trial court's ruling, evidence presented at trial may be considered in addition to the evidence presented at the hearing on the motion to suppress.[7]
At the suppression hearing, Robichaux testified that Alwert's action of writing on the form and throwing it away before leaving the room was an interrogation technique. Alwert testified that defendant had not refused to talk to the officers and specifically denied that defendant wrote "refused" on the form. After Alwert left, Robichaux attempted to defuse the situation, and apologized for Alwert's behavior. Robichaux told defendant that he did not need his confession, but that he would take his statement if he desired to give his side of the story. Robichaux then read Fasola his rights from the St. Charles Parish waiver of rights form, which the defendant signed acknowledging that he desired to give a statement. Robichaux further testified that Fasola did not request an attorney at any point while he and defendant were alone. Additionally, Robichaux testified that he put Alwert's name on the waiver of rights form, but that Alwert did not sign it, since Alwert did not witness Fasola waive his rights. Both Robichaux and Alwert testified that defendant signed the Arkansas waiver of rights form in Alwert's presence. Fasola was again advised of his rights when the tape recorded statement began.
Robichaux denied that anyone, including himself or Alwert, threatened or coerced defendant into giving the statement. Alwert said that Fasola never indicated any unwillingness to talk during the pre-interview. *542 Alwert denied that he threatened Fasola or his family during the pre-interview or Marks before she gave her statement. Alwert specifically denied that he told Fasola that his daughter would be taken away and put in foster care where she would be molested and denied that he told Fasola he would be put in jail and raped by other inmates. Alwert testified that he may have told defendant and Marks that if he found out in the course of the investigation that anyone had "knowledge of or involvement and that withheld evidence[,]" he would "put them in jail" and would "prosecute them as well."
Regarding the June 2001 statement, Robichaux testified that Fasola waived his rights before giving this statement and that he did not threaten or coerce defendant into making the statement. Robichaux pointed out that Fasola requested his presence at the jail.
At the suppression hearing, Fasola offered a different version of the events on March 20, 2001. Fasola said that he had refused to waive his rights and that he, not Alwert wrote "refused" on the discarded rights form. Thereafter, defendant said that Alwert began to issue threats. Defendant testified that Alwert told him that he was going to put his mother, his father, and Marks in jail for being accessories after the fact. In addition, Fasola said Alwert told him that he would put his daughter in foster care, where cute little girls get molested. According to Fasola, Alwert said he would put defendant in a place in jail where he would get raped and that he was going to look like a cold-blooded killer in court. Further, Fasola said Alwert told him that if he confessed, it would look better for him. Additionally, Fasola said Alwert told him that if he confessed, "they were going to give me life no matter what" and that it would be in the best interest for defendant and his family.
Fasola said that Alwert left the room after the above exchange. Defendant was then left alone with Robichaux, who essentially repeated what Lieutenant Alwert had said. Fasola said that his father had cancer at the time and was in the hospital. Defendant said he could not imagine his father in jail, and that it might have killed him. According to Fasola, it was at this point that Robichaux said that the police would leave his family alone if defendant gave a statement to the police. Thereafter, Fasola signed a new rights form waiving his rights.
Fasola said he initially denied any knowledge of Springman's murder. As the questioning progressed, Fasola said he asked Robichaux for an attorney, but that Robichaux told him that he could not call an attorney until he returned to Louisiana. Then, for the sake of his family, Fasola decided to give a statement. Defendant acknowledged that the recorded statement reflects that he said he had not been threatened. However, Fasola testified he was afraid that the police would follow through on their threats if he had answered affirmatively.
With regard to the June 2001 statement, Fasola acknowledged requesting Robichaux's presence at the jail, but denied that he said anything about his own case. According to Fasola, he initially decided to contact Detective Robichaux because he had learned of the affair between the officer and Marks, as well as to provide information about the unrelated murder. However, Fasola changed his mind about discussing the affair because he did not want any trouble. Fasola said that he did not discuss his legal strategies in his case, nor did he confess to the Springman murder again.
*543 Marks also testified that she was threatened by Alwert on March 20, 2001. Marks said that Alwert told her that she was going to be arrested and go to jail for twenty years if she knew "things" about the case and did not say anything. According to Marks, Alwert told her that her daughter would be taken away from her and placed in a foster home. Marks said she was told that she could not leave the Arkansas police station for many hours.
The thrust of defendant's argument is an attack on the trial judge's finding that Alwert and Robichaux were more credible witnesses than Fasola and Marks. The trial judge rendered seven pages of very detailed reasons in support of his ruling denying the defendant's motion to suppress. In these reasons, the trial judge found that the statements were given freely and voluntarily after defendant waived his Miranda rights. Further, the trial judge found that Fasola did not invoke his right to counsel before making the March 20, 2001 confession. The trial judge specifically stated that he did not believe Fasola and Marks with regard to their testimony that they were threatened. In particular, the trial judge found that he did not believe Fasola's testimony that his confession was induced by alleged threats regarding the arrest of his family. The trial judge found that the officers' testimony indicates that defendant was informed of the consequences for any accomplices to the crime, but that "common sense dictates to this Court" that defendant would have known his family could not have been arrested if the family was not involved in the crime. The judge further found that the fact that the Fasola initiated contact with Robichaux supported a finding that defendant did not feel threatened by the police.
When the trial court is presented with conflicting testimony, the credibility of the witnesses is a matter within the sound discretion of the trial court.[8] The voluntariness of a statement is to be determined on a case-by-case basis, and the trial judge's conclusions regarding the credibility and weight of the testimony relating to the voluntariness of the confession or statement will not be overturned unless they are not supported by the evidence.[9]
In the present case, the judge clearly credited the officers' testimony over that of Fasola and his girlfriend and it does not appear that he abused his discretion in this regard. Although there are some discrepancies between the trial judge's reasons and the transcript, they do not appear to undermine his ruling. For example, the trial judge recites that Fasola moved to suppress three statements, when he expressly moved to suppress only the March 2001 and the June 2001 statements. Further, the trial judge made a finding that Alwert had advised Fasola of his rights before tearing up the rights form. The record does not support this finding because Lieutenant Alwert specifically testified that he did not advise Fasola of his rights before tearing up the rights form. Rather, the record reflects that Robichaux advised defendant of his rights after Alwert left the interrogation room. Fasola does not contend that he was not advised of his rights, nor does he take issue with this error in the trial judge's reasons. More importantly, it does not appear this error is of any consequence, considering that the record indicates defendant was advised of and waived his Miranda rights three times before making the recorded confession.
*544 Fasola also claims that the officers' failure to record the entire interrogation constituted a violation of due process because it deprived him of the ability to present evidence of the circumstances that led to his confession. The State responds that there is no constitutional requirement that all police communications with suspects and witnesses must be recorded.
We note that Fasola did not raise this issue at any time in the trial court. In State v. Smith,[10] this Court held that the defendant's claim that he was arrested without probable cause was not properly before the court on appeal where neither the motion to suppress confession nor evidence presented at hearing on that motion raised allegations of illegal arrest. Accordingly, we decline to consider this assignment.
In his second assignment of error, Fasola argues that his rights under the federal and state constitutions were violated because he was convicted by a non-unanimous jury verdict of eleven to one.[11] Fasola acknowledges that federal and state jurisprudence have upheld the constitutionality of Louisiana's scheme permitting a guilty verdict by ten of twelve jurors in cases where punishment is necessarily at hard labor. Nevertheless, defendant contends that the "issue of non-unanimous juries is ripe for re-examination in light" of the Supreme Court's decisions in Jones v. United States,[12]Apprendi v. New Jersey,[13] and Ring v. Arizona.[14] The State responds that neither Louisiana nor federal law requires a unanimous verdict for a second degree murder conviction.
The thrust of defendant's claim in this assignment is an attack on LSA-C.Cr.P. art. 782(A) and Louisiana Constitution, art. I, § 17(A), which provide for a ten to two jury verdict when the offense is one that is necessarily punishable by hard labor, as in this case. Defendant raises this claim for the first time in his appellate brief. The general rule is that issues not submitted to the trial court for decision will not be considered by the appellate court on appeal.[15] In State v. Williams,[16] the defendant challenged the constitutionality of LSA-C.E. art. 1104 on appeal, but had not raised the issue in the trial court. The Louisiana Supreme Court pretermitted discussion of the defendant's claim, noting that "[t]he constitutionality of the statute was clearly not the central focus of any hearing and the trial record does not contain any arguments on the topic."[17]
*545 It is noted that, in State v. Brooks,[18] this Court stated that the defendant's Apprendi challenge to his habitual offender finding should be pretermitted based on Williams, but nevertheless addressed the merits of defendant's claim finding that it had no merit. As in Williams, defendant's constitutional claim was clearly not the focus of any hearing and the record contains no argument on the topic. The only mention of it is on appeal. Accordingly, based upon Williams, supra, we find that discussion of defendant's constitutional challenge is pretermitted.
In his third assignment, Fasola contends that the trial court committed reversible error in refusing to charge the jury with the law on accomplices as he requested. Fasola acknowledges that the cautionary instruction need not be given when there is material corroboration of accomplice testimony. However, Fasola contends this rule is inapplicable because the testimony of the corroborating witnesses was not credible. The State responds the instruction was not warranted because Cochran was not an accomplice, and that, in any event, his testimony was materially corroborated.
At the charge conference, Fasola requested a special instruction cautioning the jury on the reliability of accomplice testimony because defendant's confession implicated Cochran in the murder. The judge initially stated that he would read his standard accomplice instruction despite the State's objection on the basis that Cochran was not an accomplice. After a recess, the matter was revisited. The judge stated that he had reviewed the law and was not going to give an accomplice instruction because there was material corroboration of Cochran's testimony, including defendant's inculpatory statement and defendant's admissions to Brandi Marks, Jude Brandstetter and Jason Delormier.
Under LSA-C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.[19] A requested jury charge must be supported by the evidence.[20] The failure to read a requested special jury charge constitutes reversible error only when there is prejudice to the substantial rights of the defendant or the violation of some constitutional or statutory right.[21]
When the state relies upon the uncorroborated testimony of an accomplice, the trial court should instruct the jury to treat an accomplice's testimony with great caution.[22] However, such a cautionary instruction is not required where there is material corroboration of the accomplice's testimony. It is enough if there is evidence that confirms material points in an accomplice's story, the defendant's identity and some relationship to *546 the situation.[23] Whether such an instruction should be given is within the sound discretion of the trial court.[24]
At trial, Cochran testified that he was originally arrested for second degree murder, but he was indicted for accessory after the fact of first degree murder. Cochran testified that these charges were still pending at the time of trial. He denied any promises or deals had been made with him in connection with his trial testimony. There was no trial testimony to indicate Cochran was an accomplice to the murder of Springman. It is arguable, however, that Fasola's confession may have implicated Cochran because Fasola said that Cochran knew of his plan to kill Springman and because defendant said Cochran helped to conceal the body's location by throwing rocks in the hole.
Even assuming that Cochran was an accomplice based on Fasola's confession, his testimony was materially corroborated. Cochran's testimony that he was merely at the scene rather than a participant in the murder was corroborated by the testimony of Marks, Brandstetter, and Delormier. All of these witnesses testified that defendant told them that Cochran was at the Spillway when defendant shot Springman. None of them testified that defendant told them that Cochran had anything to do with the murder or disposing of the body.
Nevertheless, Fasola contends that the corroborating witnesses themselves should not have been credited because they were either actually arrested for a crime, as was the case of Cochran and Delormier, or knew that they could have been charged with a crime for concealing evidence, as was the case with Marks and Brandstetter. However, the credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.[25] Furthermore, the credibility of all of the witnesses' testimony, including the accomplice's testimony, was adequately covered by the trial court's general charge on credibility of witnesses.[26] Based on the foregoing, we find that the trial court did not err in refusing to charge the jury on accomplice testimony as requested by defendant.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920, State v. Oliveaux,[27] and State v. Weiland.[28] The following matter is noted:
There is a discrepancy between a minute entry and the corresponding transcript. According to the minute entry of August 14, 2001, which contains the district court case number of the instant appeal, defendant pled guilty pursuant to a plea agreement and received six months in parish prison. The corresponding transcript contains two other district court numbers and it reflects that defendant pled guilty to simple escape and carrying a concealed weapon, charges which apparently occurred during defendant's confinement in parish prison awaiting trial. Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails.[29] Accordingly, we remand the matter to allow the trial *547 judge to correct the August 14, 2001 minute entry to conform to the transcript.
Accordingly, for the foregoing reasons, the defendant's conviction is affirmed, and we remand to the trial court in order to correct an error patent on the face of the record.
AFFIRMED; REMANDED.
NOTES
[1] Alwert testified that the officers had decided to execute both an Arkansas and a Louisiana rights form.
[2] Delormier testified that he was arrested for accessory after the fact to murder and obstruction of justice. However, he was not indicted after testifying before the grand jury in July.
[3] Defendant does not specify whether he is challenging the trial judge's ruling on the March 2001 confession to Robichaux and Alwert or the June 2001 statement to Robichaux. Additionally, defendant fails to specify, in this assignment, the particular inconsistencies in the officers' testimony.
[4] Defendant also claimed that the confession should have been suppressed because it was made under the influence of fear, duress, intimidation, menaces, threats, inducements, and promises made by the police. Defendant does not make this argument on appeal.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] State v. Franklin, 03-287 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70, writ denied, 03-3062 (La.3/12/04), 869 So.2d 817.
[7] Id.
[8] State v. Snyder, 97-226 (La.App. 5 Cir. 9/30/97), 700 So.2d 1082, 1087.
[9] Id.
[10] 94-120 (La.App. 5 Cir. 5/31/94), 638 So.2d 452,
[11] The jury was orally polled following the guilty verdict. When the trial judge asked the jury whether the guilty verdict was the verdict of the jurors, all jurors responded affirmatively. Following written polling however, one of the jurors had written something on a slip that the trial judge stated he did not understand. As such, the judge said that he would take this to be a vote of not guilty and with the State's and defendant's agreement, stated the verdict would be recorded in the minutes as a vote of 11-1.
[12] 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999);
[13] 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000);
[14] 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[15] State v. Williams, 02-1030 (La.10/15/02), 830 So.2d 984, 988. "Constitutional issues are no exception." Id. (citing Vallo v. Gayle Oil Co., 94-1238 (La.11/30/94), 646 So.2d 859).
[16] Id.
[17] Id. at 988.
[18] 04-779 (La.App. 5 Cir. 11/30/04), 889 So.2d 1064, 1067-1068. Accord, State v. Myles, 04-434 (La.App. 5 Cir. 10/12/04), 887 So.2d 118, 124, acknowledged the above rule, but addressed a defendant's Apprendi challenge to his habitual offender finding in an abundance of caution. The Myles court found no merit in defendant's claim. Id. at 124.
[19] Id.; Accord, State v. Smith, 04-340 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 288-289.
[20] Smith, 888 So.2d at 289.
[21] Id.
[22] State v. Smith, supra; State v. Schaffner, 398 So.2d 1032, 1035 (La.1981).
[23] State v. Schaffner, supra.
[24] State v. Smith and State v. Schaffner, supra.
[25] State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
[26] See, State v. Schaffner, 398 So.2d at 1035. Accord, State v. Smith, 888 So.2d at 289.
[27] 312 So.2d 337 (La.1975).
[28] 556 So.2d 175 (La.App. 5 Cir.1990).
[29] State v. Lynch, 441 So.2d 732, 734 (La.1983).