924 So.2d 316 (2006)
STATE of Louisiana
v.
Christopher S. SHANK.
No. 05-KA-421.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 2006.
*318 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Martin Belanger, Roger Jordan, Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, State of *319 Louisiana, Gretna, Louisiana, for Plaintiff/Appellee.
Christopher Shank, Angola, Louisiana, Defendant/Appellant.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and SAM A. LeBLANC, III, Judge, Pro Tempore.
MARION F. EDWARDS, Judge.
Defendant, Christopher Shank, appeals his conviction for aggravated rape. For the reasons that follow, we affirm defendant's conviction and remand in order to correct errors patent on the face of the record.
Defendant, Christopher Shank, was indicted by a grand jury on October 9, 2003 and charged with aggravated rape in violation of LSA-R.S. 14:42. Shank initially pled not guilty and then changed his plea to not guilty by reason of insanity. Shank later abandoned his insanity defense. Shank proceeded to trial on October 27, 2004. After a two-day trial, he was found guilty as charged by a unanimous twelve-person jury. Shank was sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence.
During the early morning hours of August 9, 2003, Mr. D.[1] was awakened by Shank knocking on his door. Shank had been living with the D family for two to three months, and had been given a key to the house but lost it. Mr. D. let Shank into the house and went back to bed.
Mr. D. was awakened approximately one hour later when his youngest daughter came in and told him that his godson had wet the bed. Mr. D. took care of the matter and noticed that his five-year-old daughter, D.D., was not in her room. He asked his youngest daughter where D.D. was, and she replied that D.D. was in Shank's room. Mr. D. looked into Shank's room through a partially cracked door and saw what looked like Shank having sex with someone. Mr. D. stated Shank was under the covers, "on top and just humping." Being half asleep, Mr. D. did not think anything about it.
He looked for D.D. in his bedroom, thinking she might have crawled into bed with his wife, but she was not there. He returned to Shank's room and saw Shank lying on his side cradling D.D. Mr. D. asked D.D. what she was doing, but she did not reply. He told her to go back to her bed, but she stated she could not because she was not wearing panties. She explained that Shank had taken her panties off.
Mr. D. took D.D. to his wife at which time D.D. told her mother that Shank had pulled her panties off and touched her. According to Mrs. D, D.D. stated "she was rocking on [defendant] ... like grown-ups do." Mrs. D looked at D.D.'s vagina and saw blood. Meanwhile, Mr. D. grabbed his gun, put it to Shank's head, and ordered him to leave. After a brief scuffle, Shank left.
The police arrived shortly after Mr. D. called them. They seized D.D.'s nightgown and the bedding, which later tested negative for seminal fluids. D.D.'s panties were never found. D.D. was taken to Children's Hospital, where a rape exam was performed by Dr. Adrienne Atzemis. Dr. Atzemis testified D.D. had a *320 small laceration of the posterior forchette, which was consistent with penile/vaginal contact. However, Dr. Atzemis admitted the laceration was non-specific for sexual abuse because it could have been caused by other means.
At trial, D.D. testified she had gone into Shank's room to get some water. She stated she tried going to her mother first but her mother's door was locked and she did not wake up when D.D. knocked. When she went into Shank's room, he picked her up and put her into his bed. D.D. stated that Shank pulled her panties down and started "shaking all over" her. D.D. explained she was lying on her back and Shank was kneeling over her. She stated Shank was shaking hard and "it really was hurting a lot" on her private part, the front part of her bottom. She stated she felt Shank's private part go into her private part. D.D. testified her father came into the room, picked her up off the bed, and carried her to her mother's room. She told her father and mother that Shank had pulled her panties down and "touched her butt."
Shank was subsequently arrested. After his arrest, Sergeant Gary Cook, a supervisor in the Special Investigations Unit at the Jefferson Parish Correctional Center, was informed by the health services administrator, Nurse Miriam Schultz, that Shank may be suicidal and she had concerns for Shank's safety. Sergeant Cook approached Shank to determine his security risk, at which time Shank told him he did not want to be alone with his thoughts considering what he had done to the victim. According to Sergeant Cook, Shank proceeded to explain he had been on drugs and thought he was having sex with his girlfriend but was awakened by someone saying, "What are you doing, Uncle Chris?"
At trial, Shank testified he had taken eight Oxycontin pills the night of the incident. He stated he was in bad shape when he returned to the D family's home. He claimed he did not know D.D. was in his bed until Mr. D. turned on the light and asked D.D. what she was doing. Shank denied knowingly having sex with D.D.
In their second assignment of error, both defense counsel and defendant, pro se, argue the evidence was insufficient to convict defendant of aggravated rape.[2] Defense counsel contends the medical evidence was inconclusive and the testimony was unreliable. While Shank admits a sexual battery occurred, he argues the evidence fails to show a rape occurred. He relies on the testimony of the examining doctor who stated she could not say with medical certainty there was penile contact. He also points to the lack of seminal fluid found during the rape exam and on the victim's nightgown. Shank further maintains the victim never alleged anything more than the fact he touched her butt until she testified at trial, at which time she stated defendant's private part went inside her private part. Shank asserts the six-year-old victim[3] was coached prior to trial. Pro se, Shank further maintains he did not have the requisite intent to have sex with the victim since he was asleep during the act.
*321 The State responds that definitive physical evidence is not required to sustain an aggravated rape conviction and asserts the victim's testimony alone is sufficient to uphold the conviction.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt.[4]
Defendant was convicted of aggravated rape in violation of LSA-R.S. 14:42, which, at the time of the offense, provided in pertinent part:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
. . . .
(4) When the victim is under the age of twelve years.[5] Lack of knowledge of the victim's age shall not be a defense.
Rape is defined by LSA-R.S. 14:41 as follows:
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
"In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion."[6] With sexual offenses, the victim's testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.[7]
Shank first contends the medical evidence failed to prove penile/vaginal contact. He asserts the serology tests were negative for seminal fluid on the victim's nightgown and in her rape kit. He points out that no pubic hairs were found during the victim's rape kit examination. He further relies on Dr. Atzemis' testimony during which she stated she could not say with medical certainty that penile contact caused the laceration to the victim's posterior forchette, an area within the vagina.
The record shows that Dr. Atzemis conducted a rape kit examination on the victim. Prior to the physical exam, she took a history from the victim. The victim told Dr. Atzemis that Shank had taken her panties off and touched her butt with his hand. Dr. Atzemis' physical examination revealed a small laceration to the victim's posterior forchette. She stated such a laceration was consistent with a five year old who had penile/vaginal contact. Dr. Atzemis admitted the laceration was non-specific for sexual abuse because there are causes, other than sexual contact, that can *322 result in such a laceration, including accidental injury and scraping the area with a fingernail. D.D. and her mother both denied the victim had a problem or habit scratching herself in the private area. Dr. Atzemis further testified she has seen cases where there is full penetration without any resulting injury.
At trial, D.D. testified she went into Shank's room to ask him to get her something to drink. She stated the Shank picked her up, put her in his bed, pulled her panties down, and started "shaking" all over her. She explained that Shank's shorts were off when he was "shaking" on her. She further explained she was lying on her back on the bed and Shank was kneeling over her. She testified that Shank's private part went into her private part when he was "shaking."
Three days after the incident, D.D. was interviewed by Omalee Gordon at the Child Advocacy Center (CAC). The interview was videotaped and the videotape was played for the jury. In the videotaped interview, D.D. explained the incident in more detail. She stated that Shank was naked when he pulled her into bed with him and that he pushed up her clothes, took off her panties, and touched her butt. D.D. stated that Shank took his "birdie" and shook it on her which was how she got a cut on her "tu tu". Using dolls, D.D. indicated defendant's "birdie" was in his groin area and her "tu tu" was in her vaginal area. When asked to explain how Shank shook his "birdie" on her, D.D. demonstrated a rhythmic front to back motion with her hips. She stated she was lying on her back while Shank knelt over her and "shook" on her. She explained he "shook" his "birdie" on both the outside and inside of her "tu tu." D.D. further stated Shank kept kissing her "like when you're in love" and "like you're married." She then demonstrated an opened-mouth kiss.
In addition to challenging the medical evidence as inconclusive, Shank challenges the reliability of the testimony. He claims D.D.'s testimony was inconsistent because she never claimed anything more than him touching her butt until she testified at trial. Shank's assertion is incorrect. As noted above, during the CAC interview, D.D. stated Shank's "birdie" (which she indicated was his penis) touched both the inside and outside of her "tu tu" (which she indicated was her vagina).
It is not the function of the appellate court to assess the credibility determinations of the trier of fact or to reweigh the evidence.[8] "The trier of fact shall evaluate the witnesses' credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness."[9]
In State v. Turner,[10] the defendant contended the evidence was insufficient to support the jury's verdict of aggravated rape because the only evidence of rape was the victim's unbelievable testimony. However, this Court considered that, from the date of the incident, the victim continuously maintained the defendant raped her and the details of the incident were consistent when she told her mother, the police officers, the doctors, and in her taped statement.[11] *323 After acknowledging that the jury made a credibility judgment by believing the victim's version of the events over the defendant's version, this Court decided that the State proved the essential elements of the crime beyond a reasonable doubt.[12]
In State v. Hubbard,[13] this Court found the victim's testimony alone was sufficient to uphold defendant's conviction for aggravated rape. The issue in Hubbard was the sufficiency of evidence that there was sexual penetration. The victim testified that defendant made her "have sex" with him. She affirmatively answered a question of whether defendant raped her. This Court determined this to be sufficient evidence to prove penetration. This Court noted that the testimony of the victim alone, unsubstantiated by physical evidence, is sufficient to support a conviction of rape.
In this case, D.D. was five years old at the time of the incident. She stated Shank took off her panties and "shook" his "birdie" in and on her "tu tu" which caused a cut. D.D.'s mother and father both testified that D.D. told them Shank had taken off her panties. According to her mother's testimony, D.D. told her Shank had touched her and that she "was rocking on him ... like grown ups do." Mrs. D looked at D.D.'s vagina and noted it was red and swollen. She also saw blood. D.D.'s father testified he observed Shank "on top and just humping" like he was having sex with someone. Dr. Atzemis testified D.D. had a laceration to her posterior forchette, which was consistent with penile/vaginal contact. Although Dr. Atzemis stated D.D. only claimed Shank touched her with his hand, she explained it is not unusual for a child not to give full disclosure whether it is attributable to the child's comfort level or whether the child understands the importance of certain details.
Additionally, according to Sergeant Gary Cook, Shank stated he had been on drugs and thought he was having sex with his girlfriend at the time. Once defendant realized it was D.D., he grabbed her and told her he was sorry. Shank also told Sergeant Cook he was afraid he had hurt D.D. He further stated he was now a child molester. Another State witness, Russell Buras, testified he was in the cell next to Shank for three days. Mr. Buras stated he had numerous conversations with Shank and that Shank admitted fondling and penetrating D.D.
Although Shank denied he made these statements to Sgt. Cook and Mr. Buras, the jury found D.D. and the other State witnesses to be credible, a finding which is supported by the record. After viewing the evidence in a light most favorable to the prosecution, we hold that a rational trier of fact could have found, beyond a reasonable doubt, that the evidence was sufficient to support defendant's conviction for aggravated rape.
Shank's claim that he did not knowingly have sex with the victim because he was asleep is of no consequence. Aggravated rape is a general intent crime and, thus, the only intent necessary to sustain a conviction is established by the very doing of the proscribed acts.[14]
*324 In Shank's first pro se assignment of error, and in the first assignment of error by his defense counsel, it is argued that Shank's statements, one to Sgt. Cook and one to Russell Buras, should have been suppressed. Shank contends his statement to Sgt. Cook was obtained in violation of his Miranda[15] rights and, thus, constituted an involuntary confession. He maintains his statement to Russell Buras was obtained in violation of his right to counsel because Mr. Buras was a paid informant and was intentionally used by the police to induce an incriminating statement from Shank outside his counsel's presence. Shank also asserts his statement to Mr. Buras should have been suppressed because its existence was not timely disclosed.
Regarding Shank's statement to Sgt. Cook, the State contends there was no Miranda violation because the statement was spontaneous and not made during an interrogation. As for the admissibility of defendant's statement to Mr. Buras, the State argues the issue was not preserved for appeal because it was never the subject of a motion to suppress and Shank never objected to the admissibility of the statement made to Mr. Buras.
Before a confession can be introduced into evidence, the State has the burden of affirmatively proving it was freely and voluntarily given, and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451. It must also be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights.[16]
"Spontaneous and voluntary statements not given as a result of police interrogation or compelling influence, are admissible in evidence without Miranda warnings, even if the defendant is in custody."[17] Police officers are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as the statements do not result from police-initiated custodial interrogation or questioning "reasonably likely to elicit an incriminating response."[18]
The voluntariness of a statement is to be determined on a case-by-case basis. The trial judge's conclusions regarding the credibility and weight of the testimony relating to the voluntariness of a statement or confession will not be overturned unless they are not supported by the evidence.[19]
The record does not contain a written motion to suppress. However, there is a transcript of a March 30, 2004 hearing on a motion to suppress defendant's statement made to Sgt. Cook. During the March 30 hearing, Sgt. Cook was the only witness to testify. He stated he is the supervisor of the Special Investigative Unit at the Jefferson Parish Correctional Center and is in charge of security matters in the jail.
Sgt. Cook testified that he interviewed Shank on August 15, 2003 after he was advised by the medical director, Nurse Miriam Schultz, that Shank was in intake *325 booking, was highly agitated, and was facing a serious charge. She advised Sgt. Cook she was considering placing him on a suicide watch because she thought Shank might be dangerous to himself or others. At trial, Nurse Schultz testified she contacted Sgt. Cook because she was very concerned about Shank, because certain inmates can be vulnerable in the general population of the jail.[20] Sgt. Cook explained he went to talk to Shank to ascertain his security risk.
Sgt. Cook, along with two other deputies, removed Shank from housing and brought him to the visitation tank for privacy reasons. He asked Shank what problems he was having. Sgt. Cook specifically told Shank that he was not advising him of his rights, that he was not asking him about his case or charge, and that he was not interested in talking about his case or charge. Shank proceeded to tell Sgt. Cook he was upset, that he did not want to be in the housing area where he was assigned, that he did not want to be alone with his thoughts facing the charge he was facing. Sgt. Cook warned Shank again not to talk about his case. Nonetheless, Shank went on to explain to Sgt. Cook that he had been under the influence of Oxycontin, heroin, and Xanbars and was passed out in his bed. Shank stated he thought he was lying next to his girlfriend, rolled over on top of her, and then heard the victim say, "what are you doing Uncle Chris?" Shank told Sgt. Cook he is now a child molester.
Sgt. Cook testified he warned Shank several times that he was not there to speak to Shank about the incident. After Shank gave his statement, Sgt. Cook did not ask any follow up or clarifying questions. He stated he had no knowledge of the case and was not assigned to investigate it.
Based on the evidence presented, it appears that Shank's statement to Sgt. Cook was made voluntarily and spontaneously, and not in response to an interrogation. In State v. Sanders,[21] the Louisiana Supreme Court determined defendant's statement to an FBI agent was admissible despite defendant's request for an attorney and to remain silent. The supreme court explained "interrogation" under Miranda is limited to those instances where the words or actions of the police are "reasonably likely to elicit an incriminating response from the suspect."[22] The supreme court noted the FBI agent continued to ask questions but only as to "routine background" matters such as age and marital status. The supreme court concluded the FBI agent's questioning about "administrative matters should not have led defendant to conclude the police sought an inculpatory statement."[23]
In the present case, Sgt. Cook questioned defendant about how he was doing in the context of assessing his security risk within the jail. He warned Shank several times not to talk about his case and stated he was not interested in defendant's case or charge. Considering the context of the encounter, there was no investigating interrogation that required defendant be advised of his Miranda rights. Defendant's *326 statement to Sgt. Cook was voluntary and spontaneous. Therefore, we find that the trial court did not err in denying the motion to suppress.
Regarding the admissibility of defendant's statement to Russell Buras, the State is correct in its assertion that the matter was not preserved for appeal. The record shows that the day before trial, the State filed a notice of its intent to use defendant's statement to Russell Buras. The matter was brought to defendant's attention during a hearing in open court on October 26, 2004. Shank made no objections. On the second day of trial, the State called Russell Buras to testify. Again, there was no objection by defendant. During Mr. Buras' testimony, Shank lodged one objection on the basis Mr. Buras' testimony circumvented defendant's right to testify. The objection was overruled by the trial court. At no time did Shank object to the admissibility of Mr. Buras' testimony on the basis that it violated his right to counsel, or was prejudicial because of delayed disclosure.
In order to preserve an issue for appeal, a party must make a contemporaneous objection. LSA-C.Cr.P. art. 841(A) provides, in part, that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem and to prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might have been easily corrected by an objection.[24]
A contemporaneous objection to the court's ruling on a written motion is generally not required. LSA-C.Cr.P. art. 841(B). However, there is no indication in the record that defendant's statement to Russell Buras was ever made a part of defendant's motion to suppress. Additionally, Shank never argued to the trial court that his right to counsel was violated by Russell Buras. He raises this issue for the first time on appeal. A new issue cannot be raised for the first time on appeal.[25] Therefore, as that portion of defendant's assignment of error relating to the admissibility of his statement to Russell Buras was not preserved for appeal, we will decline to consider it.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[26] and State v. Weiland.[27] The following matters are noted.
First, the trial court failed to properly inform Shank of the prescriptive period for filing post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8. After sentencing, the trial court stated that defendant had "two (2) years from the date this conviction becomes final to seek post-conviction relief." This Court has held that the failure to advise defendant that the prescriptive period runs from the time his conviction and sentence become final renders the advisal incomplete.[28] Therefore, we remand with an order that the trial court properly inform defendant of the time from which prescription for post-conviction relief runs, by sending written notice of such to defendant within ten days *327 of the rendition of the appellate opinion, and to file written proof that defendant received the notice in the record.[29]
Second, the record does not reflect that defendant was notified of the sex offender registration requirements. Defendant's conviction is defined as a sex offense by LSA-R.S. 15:541(14.1). LSA-R.S. 15:540, et seq. requires registration of sex offenders. Further, LSA-R.S. 15:543(A) requires the court to notify a defendant of the registration requirements as follows: "The court shall provide written notification to any defendant charged with a sex offense of the registration requirements of R.S. 15:542. Such notice shall be included on any guilty plea forms and judgment and sentence forms provided to the defendant."
This Court has held that the trial court's failure to provide this notification constitutes an error patent and warrants a remand for written notification.[30] We, therefore, order the trial court to inform the defendant of the registration requirements of LSA-R.S. 15:543(A) by sending written notice to the defendant within ten days of this Court's opinion, and to file written proof in the record that the defendant received the notice.[31]
For the foregoing reasons, the defendant's conviction is affirmed, and we remand in order to correct errors patent on the face of the record.
AFFIRMED; REMANDED.
NOTES
[1] The victim and her family are identified by initials so as to protect her identity. See, LSA-R.S. 46:1844(W)(3).
[2] It is noted that defendant did not file a motion for post-verdict judgment of acquittal pursuant to LSA-C.Cr.P. art. 821. However, this failure does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La.1982); State v. Carey, 04-1073 (La.App. 5 Cir.3/29/05), 901 So.2d 509, 512, fn. 4.
[3] The victim was five years old at the time of the alleged rape but six years old at the time of trial.
[4] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[5] Effective August 15, 2003, Acts 2003, No. 795, § 1 substituted "thirteen years" for "twelve years" in paragraph (A)(4).
[6] State v. Turner, 05-75 (La.App. 5 Cir.5/31/05), 904 So.2d 816, 823 (citing State v. Robinson, 02-1869 (La.4/14/04), 874 So.2d 66, 79, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004)).
[7] State v. Turner, supra (citing State v. Hotoph, 99-243 (La.App. 5 Cir.11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066).
[8] State v. Carter, 98-24 (La.App. 5 Cir.5/27/98), 712 So.2d 701, 708, writ denied, 98-1767 (La.11/6/98), 727 So.2d 444 (citations omitted).
[9] State v. Crawford, 03-1494 (La.App. 5 Cir.4/27/04), 873 So.2d 768, 786, writ denied, 04-1744 (La.5/6/05), 901 So.2d 1083 (citation omitted).
[10] 05-75 (La.App. 5 Cir.5/31/05), 904 So.2d 816, 821.
[11] Id. at 823.
[12] Id.
[13] 97-916 (La.App. 5 Cir.1/27/98), 708 So.2d 1099, 1103-1104, writ denied, 98-0643 (La.8/28/98), 723 So.2d 415,
[14] State v. Kennedy, 00-1554 (La.4/3/01), 803 So.2d 916, 923.
[15] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[16] State v. Williams, 04-697 (La.App. 5 Cir.11/30/04), 889 So.2d 1135, 1142-1143, writ denied, 05-0395 (La.5/13/05), 902 So.2d 1017.
[17] Id. at 1143 (quoting State v. Castillo, 389 So.2d 1307, 1310 (La.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981)).
[18] State v. Ross, 95-1798 (La.3/8/96), 669 So.2d 384, 386.
[19] State v. Williams, supra, at 1143.
[20] In reviewing the trial court's ruling on a motion to suppress, evidence presented at trial may be considered in addition to the evidence presented at the hearing on the motion to suppress. State v. Fasola, 04-902 (La.App. 5 Cir.3/29/05), 901 So.2d 533, 541.
[21] 93-0001 (La.11/30/94), 648 So.2d 1272, 1282-1283, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).
[22] Id. at 1282 (quoting State v. Abadie, 612 So.2d 1 (La.), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993)).
[23] State v. Sanders, supra, at 1283.
[24] State v. Brown, 01-160 (La.App. 5 Cir.5/30/01), 788 So.2d 667, 673.
[25] State v. Merritt, 04-204 (La.App. 5 Cir.6/29/04), 877 So.2d 1079, 1082, writ denied, 04-1849 (La.11/24/04), 888 So.2d 228.
[26] 312 So.2d 337 (La.1975).
[27] 556 So.2d 175 (La.App. 5 Cir.1990).
[28] State v. Grant, 04-341 (La.App. 5 Cir.10/26/04), 887 So.2d 596, 598.
[29] Id.
[30] See, State v. Stevenson, 00-1296 (La.App. 5 Cir.1/30/01), 778 So.2d 1165, 1166-1167.
[31] This Court has not made a distinction between those defendants with life sentences and those who have received less than life sentences for purposes of the required written notice of LSA-R.S. 15:543. See, State v. Simmons, 03-20 (La.App. 5 Cir.4/29/03), 845 So.2d 1249; State v. Dickerson, 01-1287 (La. App. 5 Cir.6/26/02), 822 So.2d 849, 859, writ denied, 02-2108 (La.2/21/03), 837 So.2d 627; State v. Wallace, 00-1745 (La.App. 5 Cir.5/16/01), 788 So.2d 578, 588, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297.